**FILED**

DEC - 4 2009

Clerk, U.S. District and
Bankruptcy Courts

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LG ELECTRONICS U.S.A., INC.<br>1000 Sylvan Avenue, Englewood Cliffs,<br>N.J. 07632 | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| U.S. DEPARTMENT OF ENERGY,<br>1000 Independence Ave., S.W.,<br>Washington, D.C. 20585 | ) ) ) ) |
| and | ) ) |
| STEVEN CHU, PHD.,<br>*in His Official Capacity as United States*<br>*Secretary of Energy,*<br>U.S. Department of Energy,<br>1000 Independence Ave., S.W.,<br>Washington, D.C. 20585, | ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Civil Action No.

Case: 1:09-cv-02297
Assigned To : Bates, John D.
Assign. Date : 12/4/2009
Description: TRO/PI

## COMPLAINT

## FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

Plaintiff LG Electronics U.S.A., Inc. ("LG"), in its complaint against the U.S.

Department of Energy (the "Department," or "DOE") and Dr. Steven Chu, in his official

capacity as Secretary of the Department (collectively "Defendants"), alleges as follows:

**NATURE OF THE ACTION**

1.      Without any proper notice, DOE has issued an arbitrary and infeasible order to LG.  The order revokes a vital and valuable government designation concerning energy efficiency and requires LG to remove that designation from critical product lines already in the market by January 2, 2010, at great cost and immeasurable reputational damage to LG.

2.      In a November 10, 2009 letter to Plaintiff, DOE abruptly changed the standard for testing certain refrigerator-freezers to meet the Energy Policy and Conservation Act of 1975 ("EPCA") standards, 42 U.S.C. § 6291 *et seq,* and to qualify under the Energy Star program. DOE's sudden change to its testing criteria was not preceded by any notice and comment process and is contrary to prior statements to industry about what its regulations require.

3.      DOE's action also violates an agreement that DOE reached with LG on November 14, 2008 ("2008 Agreement") that articulated these permitted testing criteria both to LG and the industry generally.

4.      In a complete reversal of its prior position, DOE's November 10, 2009 letter announced that under its modified testing standard, LG for the first time must report energy from the fill tube and ice ejection heaters when determining a model's energy efficiency and must modify products already distributed in commerce.  This startling and arbitrary action will cause LG lasting, immediate, and irreparable harm to its reputation, its market share, and its relations with distributors, retailers, and others in the chain of commerce within this country.  While DOE may be entitled to promulgate new standards for all of industry to follow, it first must provide the legally required administrative procedures and opportunities for comment, as well as a reasonable period for manufacturers to accommodate such changes.

5.      Pursuant to EPCA, DOE is responsible for issuing critically-important regulations that establish consistent, national energy efficiency requirements that are both technically feasible and economically justified.

6.      DOE and LG believed that the 2008 Agreement, identified in Paragraph 3 above, had "completely . . . settle[d] . . . all disputes . . ." between them regarding the standard to be used in testing the refrigerator-freezers at issue.  At that time, DOE recognized that the criteria specified in the 2008 Agreement with LG were "consistent" with DOE's interpretation of the correct testing standard for all of industry.  Since that date, LG has fully performed all of its obligations under the 2008 Agreement at a cost of tens of millions of dollars.

7.      DOE's November 10, 2009 letter does not dispute LG's full performance of the 2008 Agreement, but abruptly and incorrectly declares that LG's use of the testing standard confirmed in the 2008 Agreement has given LG "an unintended advantage."  DOE's insinuation that LG has been subject to a different testing standard than the rest of industry is flatly incorrect. In fact, as stated in the 2008 Agreement itself, the testing criteria required under the 2008 Agreement is entirely consistent with DOE's interpretation of the "operating conditions specified in HRF-1," which is the testing standard required by DOE regulation.  In addition, DOE based its conclusions in its November 10, 2009 letter on inaccurate and faulty technical data, which to date DOE has not fully shared with LG.

8.      DOE did not provide the legally required notice or an opportunity to comment to LG or any other member of the industry or interested public before changing its testing standard identified in the 2008 Agreement.  Instead, DOE wrote a letter to LG alone and demanded that, within 15 days, LG remove the Energy Star label from certain refrigerator-freezers that had already been tested, manufactured, distributed and/or made available for sale on the retailing

floor under DOE's longstanding requirements, in full compliance with the 2008 Agreement. DOE does not dispute that under the 2008 Agreement with LG, these models properly had been determined to qualify as Energy Star products. Although DOE subsequently extended this deadline until January 2, 2010, the deadline will continue to affect LG products already produced, distributed and/or offered for sale in reliance upon the 2008 Agreement. Moreover, DOE also stated its intention prospectively to de-list LG's models from the Energy Star program if they were not shown to qualify under DOE's modified testing requirements by that date.

9.      DOE's letter also prohibits LG from distributing in commerce models that do not meet EPCA standards as measured by DOE's modified testing criteria after 120 days, a deadline that DOE subsequently extended by one week. DOE's action will cause immediate and irreparable harm to LG, similar to the injury described in Paragraph 4, above.

10.     The LG refrigerators that are the subject of DOE's arbitrary and retroactive demands are "French Door" refrigerators with a bottom freezer, double refrigerator doors, and water and ice dispensers in the door. LG has been a leader and an innovator in this fast-growing and high-end segment of the refrigerator market.

11.     Critically, while DOE has told LG it shall be subject to modified testing criteria that require the fill tube heater and ice ejection heaters to be turned on, it has yet to inform LG about the specific testing methodology for the modified testing standard. Energy consumption testing for refrigerator-freezers is complicated and the limited documentation DOE has provided LG does not identify a testing methodology that a manufacturer needs to know to plan, design, and test complaint units. Instead, DOE has indicated that it will publically announce its modified testing standard sometime in mid-December, but still will hold LG accountable to that standard at the point-of-sale as of January 2, 2010. LG will conform to any standard properly articulated

4

by DOE through required procedures and with reasonable lead time, but two weeks notice cannot suffice under the law.

12.     DOE is obligated under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 701-706, to conduct a nationwide rulemaking if it wants to change its established interpretation of the testing criteria required by its regulations.

13.     In fact, DOE recently initiated such a rulemaking process to update the refrigerator-freezer energy standards and related test procedures. This rulemaking is scheduled to be completed by December 31, 2010 and to go into effect on January 1, 2014. *See* 74 Fed. Reg. 58915, 58916 (November 16, 2009). As to LG however, and the products covered by the 2008 Agreement with DOE, the agency declined to wait until the completion of the rulemaking process, which is expected to result in new testing criteria. Instead, even as it acknowledges LG's reliance on the 2008 Agreement, DOE has demanded that LG comply with new testing criteria that have not been subject to a rulemaking process.

14.     DOE's November 10, 2009 letter claims that test results showed that LG's models would not qualify for Energy Star or comply with the energy efficiency standards "[w]hen tested according to the existing DOE test procedure." These test results, however, show that they were not based on DOE's existing testing criteria. Moreover, the test results are based on flawed analysis, yielded divergent results, and included incomplete data.

15.     DOE has also failed to support its *diktat* to LG with an administrative record. DOE's new demand is based, in part, on secret information submitted by market competitors as well as test results based on an undisclosed testing protocol. Neither LG nor other interested parties were able to review and comment upon this information before DOE decided to change its testing requirements. The failure of DOE to follow the dictates of the APA has directly led to

a mis-informed and defective regulatory outcome that does not take into account various technical issues related to the testing of refrigerator-freezers.

16.    This is an action to hold unlawful and set aside DOE's orders, set forth in its November 10, 2009 letter (as amended by DOE's November 25, 2009 email extending certain deadlines) as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, as depriving LG of its fundamental right to liberty and property without due process, and as agency action that was taken without observance of procedure required by law.

17.    DOE's action—which requires that LG comply with testing criteria that have not been subject to a notice-and-comment rulemaking process, let alone publically announced, and retroactively imposes those criteria on products already on the market—violates the APA, 5 U.S.C. §§ 701-706, and the Due Process Clause of the Fifth Amendment to the United States Constitution.  DOE's action also violates its mandatory statutory duty under the Energy Policy Act of 2005, 42 U.S.C. § 6294a, which requires that DOE solicit public comment <u>before</u> revising an Energy Star product category, specification or criterion, and upon adoption of any such revision, provide "reasonable notice" of and "an explanation" of the changes, and a response to comments, as appropriate.  42 U.S.C. § 6294a(c)(5)-(6).  DOE's action also fails to provide "appropriate lead time," as required by this statute, *id.* at § 6294a(c)(7), and it ignores the express provisions of that law that "grandfather" all products that are in use and comply with a previous standard, *id.* at§ 6293(e)(3).

18.    LG requests a declaratory judgment that Defendants' order to LG to comply with a modified testing standard: (1) is without observance of procedure required by 42 U.S.C. § 6294a; (2) constitutes a significant change in the agency's established interpretation of its regulations without notice and comment in violation of the APA, 5 U.S.C. §§ 553, 706(2)(D); (3)

is an arbitrary and capricious exercise of the Secretary's authority in violation of the APA, 5 U.S.C. § 706(2)(A)-(D); (4) violates EPCA, including the requirement that "grandfathers" products manufactured "before the date on which the amended energy conservation standard becomes effective," 42 U.S.C. 6293(e)(3); (5) violates fundamental principles of due process guaranteed by the Fifth Amendment of the United States Constitution; and (6) is, therefore, without force and effect.

19.     LG further seeks an injunction barring DOE from applying its modified testing standard and preserving LG's ability to carry the Energy Star logo on products made in reliance on the 2008 Agreement until such time as DOE follows proper procedures in promulgating the modified testing standard.  LG is also entitled to injunctive relief barring Defendants from implementing their unlawful testing requirements, or decisions made thereunder, and an injunction requiring Defendants to follow appropriate notice-and-comment procedures before issuing or implementing any modified standard for refrigerator-freezers.  Additionally, LG seeks to set aside Defendants' application of this policy to LG in a manner that denies LG and the industry a reasonable and appropriate period of time to transition from its current testing criteria to testing criteria that would conform to Defendants' modified regulatory standard.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1361 (mandamus).

21.     The relief requested is authorized pursuant to 28 U.S.C. § 1651 (all writs act); 28 U.S.C. § 2201 (declaratory relief); and 28 U.S.C. § 2202 (further relief).

22.     LG has a right to bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 – 706 because DOE has engaged in final agency action presenting an actual controversy for which LG  is entitled to relief.

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because this is a civil action in which one of the defendants is an officer of the United States that resides in this judicial district or an agency of the United States that resides in this judicial district.

## PARTIES

24.     Plaintiff LG is a Delaware corporation, which has its United States corporate headquarters for audio, video, television, computer products and home appliances at 1000 Sylvan Avenue, Englewood Cliffs, N.J. 07632.  LG is one of the world's leading manufacturers of consumer electronics and home appliances.  LG is also a leading innovator in advancing energy efficiency, reducing the carbon footprint of its manufacturing, transportation, and products, promoting alternative energy, and furthering environmental sustainability throughout its supply chain.

25.     LG is aggrieved by DOE's action because, among other things, DOE's actions: (1) will preclude certain energy efficient LG models from qualifying for the Energy Star program and from meeting statutory energy efficiency standards; (2) will cause LG undue reputational and economic hardship in complying with Defendants' demand to remove Energy Star labels from the affected models already on the market and to contact retailers; and (3) will cause LG significant costs and harm across numerous product lines by establishing unrealistic deadlines for the modified testing requirements for purposes of Energy Star and the statutory energy efficiency standards on a prospective basis. Further, LG has spent tens of millions of dollars implementing the 2008 Agreement, and will lose the benefit of significant provisions under the 2008 Agreement if DOE proceeds arbitrarily and without providing proper notice.

26.     Because DOE is attempting to change its testing requirements, and has only provided LG until January 2, 2010, to remove Energy Star labels and notify retailers, as

demanded in its November 25, 2009 email, this situation is urgent and threatens immediate and irreparable harm to LG for which interlocutory relief is appropriate.

27.     DOE's action also threatens immediate and irreparable harm warranting interlocutory relief because DOE is further attempting to change its testing requirements for purposes of EPCA's energy efficiency standards, and has only provided LG until March 17, 2010 to bring its products into compliance with this revised standard.

28.     Defendant U.S. Department of Energy, which has its principal office at 1000 Independence Avenue, SW, Washington, DC 20585, is a federal agency headquartered in the District of Columbia. The Department of Energy is responsible for, among other things, issuing the energy efficiency standards and coordinating the Energy Star program with the U.S. Environmental Protection Agency ("EPA").

29.     Defendant Steven Chu, Ph. D., is sued in his official capacity as United States Secretary of Energy.  As Secretary, Dr. Chu has ultimate responsibility for the activities of the Department, including those actions complained of herein.  Secretary Chu maintains an office at 1000 Independence Avenue, SW, Washington, DC 20585.

## GENERAL ALLEGATIONS

**I.      Statutory And Regulatory Background.**

30.     Various U.S. government agencies, including DOE, address the energy efficiency of appliances, including refrigerator-freezers.  Such controls are accomplished through minimum efficiency standards established by DOE pursuant to the EPCA and bolstered by the voluntary Energy Star program (jointly administered by DOE and EPA) that encourages appliance makers to market products that exceed the statutory minimum energy efficiency standards.

31.     LG is one of industry's strongest supporters of the Energy Star program.  LG produces refrigerator-freezers, televisions, clothes washers, dishwashers, computer monitors,

dehumidifiers, room air conditioners, digital to analog converters, DVD and Blu-ray products and home audio/video products that bear the Energy Star logo.   In further support of this program, LG recently established  an appliance research center in Illinois that is designed to achieve even greater energy efficiency in electronic appliances.

### A.    Energy Efficiency Standards

32.    EPCA established an energy conservation program for major household appliances in 1975.  EPCA was amended by the National Energy Conservation Policy Act of 1978 ("NECPA"), Pub. L. 95-619, to, among other things, give DOE the authority to regulate the energy efficiency of several products, including residential refrigerator-freezers—the products that are the focus of this litigation.  Further amendments to EPCA in the National Appliance Energy Conservation Act of 1987 ("NAECA"), Pub. L. 100-12, established minimum energy efficiency standards for refrigerator-freezers, and required that DOE conduct rulemakings to determine if more stringent standards were justified. 42 U.S.C. 6295(b).

33.    In 1989, DOE promulgated a final rule updating the statutory performance standards established in NAECA. 54 Fed. Reg. 47916 (November 17, 1989).  The new standards became effective on January 1, 1993.  DOE subsequently issued a correction to these standards in 1990 (55 Fed. Reg. 42845 (Oct. 24, 1990)), and amended them in 1997, with an effective date of July 1, 2001.  62 Fed. Reg. 23102 (April 28, 1997).   In April 2005, DOE granted a petition requesting another rulemaking regarding the energy efficiency standards for refrigerators. *See* Energy Department Grants Petition for New Refrigerator Energy Efficiency Standards, (April 13, 2005), http://www.aceee.org/press/0504doepetition.htm.  Events overtook this rulemaking process when Congress, in the Energy Independence and Security Act of 2007 ("EISA"), required DOE to publish a final rule no later than December 31, 2010 to amend the energy

efficiency standards for refrigerators manufactured on or after January 1, 2014. Pub. L. 110-140, 121 Stat. 1491.

34.    DOE has since embarked on the proper rulemaking process required by the EISA. In 2008, DOE published a detailed Energy Conservation Standards Rulemaking Framework Document for Residential Refrigerators, Refrigerator-Freezers, and Freezers (DOE, Sept. 29, 2008) ("DOE 2008 Framework"), and held a public stakeholders meeting to discuss this document on September 28, 2008.  On November 16, 2009, DOE announced the availability of its Preliminary Technical Support Document: Energy Efficiency Program For Consumer Products: Refrigerators, Refrigerators-Freezers, and Freezers (DOE, November 2009) ("DOE 2009 Technical Report"), and a public meeting to be held on December 10, 2009 to discuss DOE's rulemaking plans.  79 Fed. Reg. 58915 (November 16, 2009).

35.    DOE's regulations require that compliance with the refrigerator energy efficiency standards must be demonstrated using the Uniform Test Method for Measuring the Energy Consumption of Electric Refrigerators and Electric Refrigerator-Freezers, typically known as 10 C.F.R. Pt. 430, Subpt. B. App. A1, and by reference, HRF-1-1979.  The HRF-1-1979 test procedure was initially developed by Association of Home Appliance Manufacturers ("AHAM"), and is referred to as the AHAM – HRF-1 procedure.  DOE incorporated AHAM – HRF-1-1979 into 10 C.F.R. Part 430 in 1982.  47 Fed. Reg. 34517 (Aug. 10, 1982).  DOE has amended this test procedure three times since 1982, each time pursuant to notice-and-comment rulemaking, though none of the changes were relevant to the issues in dispute in this matter.  For purposes of this action, the test procedure required by the regulations has remained unchanged since 1982.

36.     Section 7.4.2 of HRF-1-1979 requires that automatic ice makers are to be "inoperative" during testing.  This requirement reflects the reality that not all refrigerator-freezers sold today have automatic ice makers.  Therefore, to provide consumers with the ability to make an "apples-to-apples" comparison of different products, including those with an automatic ice making feature, the automatic ice maker is made inoperative when measuring energy consumption.  While LG supports DOE's efforts to amend its regulations in order to fairly capture energy consumption from additional refrigerator-freezer components, it must be done on an industry-wide basis, through a notice-and-comment rulemaking.

37.     Section 3.5 of HRF-1-1979 defines an automatic ice maker as the component of a refrigerator that "produces, harvests, and stores ice in an ice storage bin."  Therefore, pursuant to DOE's testing standard, the energy consuming components involved in (1) production; (2) harvesting; and (3) storage of ice should be turned off during energy efficiency testing.

38.     One key component in the production of ice in LG's automatic ice maker design is the fill tube heater.  A fill tube is a small pipe carrying water to the mold cavity in the ice maker where water is frozen into ice.  The fill tube heater is directly involved in the production of ice because it keeps the water from freezing in the tube that conveys the water used to make the ice (i.e., without the tube heater, the ice will not be produced).  LG's patents and a long history of patents similarly reveal that a fill tube heater is an integral part of the ice maker.  In patent numbers 6,810,680 and 6,915,644, an "ice maker assembly" is defined as "including: a mold cavity for collecting liquid to be frozen; and a fill tube for transporting liquid to the mold cavity. . . ."  A photograph of the interior of LG's ice maker involved in this dispute, showing the fill tube heater, is attached to this Complaint as Exhibit A.

39.     Another key component of the production, harvesting, and storing of ice in a modern automatic ice maker is an ice ejection heater, which is found in most modern refrigerators with ice makers.  Section 3.5.1 of HRF-1-1979 defines a cyclic type icemaker as "[a]n automatic icemaker with separate and sequential water fill, freezing and harvesting phases of the ice-making operation."  An ice ejection heater is directly involved in the harvesting of ice because it establishes the temperature necessary to allow ice to be separated from the mold and ejected into the storage area during the operation of the automatic ice maker.  A photograph of the interior of LG's ice maker involved in this dispute, showing the ice ejection heater, is attached to this Complaint as Exhibit A.

40.     Because they are involved in the production, harvesting, and storing of ice, in accordance with the plain language of HRF-1-1979, and consistent with DOE's prior statements about these regulatory requirements, the fill tube heater and ice ejection heater should be turned off during testing and not included in the reported total energy usage.  LG and other members of the refrigerator-freezer industry have understood that DOE's testing criteria involves turning off the fill tube and ice ejection heaters during testing and have produced countless refrigerator-freezers based on that plain language interpretation of the testing criteria.

41.     Whenever Congress has spoken on the issue of energy conservation standards, it has required that manufacturers be provided sufficient lead time before the effective date of new or revised standards.  For example, in directing the National Highway Traffic Safety Administration amend the corporate average fuel economy ("CAFE") standards, Congress required that the standards for a given model year be adopted at least 18 months before the beginning of that model year.  See 49 U.S.C. § 32902(g)(2).  More directly on point, in directing that DOE "publish a final rule determining whether to amend the standards in effect for

refrigerators, refrigerator-freezers, and freezers," Congress required that DOE provide three years of lead time by requiring that DOE publish a final rule by December 31, 2010, that is effective for products manufactured on or after January 1, 2014. *See* 42 U.S.C. § 6295(b)(4)). Similarly, the statutory requirements for Energy Star require that in revising a program criterion, DOE take "into account the timing requirements of the manufacturing, product marketing, and distribution process for the specific product addressed" and provide "appropriate lead time," which must be 270 days unless otherwise specified, before the effective date. 42 U.S.C. § 6294a(c)(7). EPCA also recognizes the importance of only applying a revised standard prospectively by requiring that "[m]odels of covered products in use before the date on which the amended energy conservation standard becomes effective (or revisions of such models that come into use after such date and have the same energy efficiency, energy use, or water use characteristics) that comply with the energy conservation standard applicable to such covered products on the day before such date shall be deemed to comply with the amended energy conservation standard." 42 U.S.C. § 6293(e)(3). DOE's action against LG must be judged against this statutory background.

**B.    Energy Star Program**

42.    Energy Star is a program established by statute and jointly administered by DOE and EPA, which is intended to "identify and promote energy-efficient products in order to reduce energy consumption, improve energy security, and reduce pollution through voluntary labeling of, or other forms of communication about, products and buildings that meet the highest energy conservation standards." 42 U.S.C. § 6294a. Manufacturers of appliances that qualify for the Energy Star program are entitled, among other things, to use the Energy Star logo on those products and in accompanying marketing literature.

43.    The energy efficiency and Energy Star testing standards are inextricably intertwined. In order to qualify for Energy Star, refrigerators must be at least 20% more energy

efficient than the standards mandated by EPCA. *See* ENERGY STAR® Program Requirements for Residential Refrigerators and/or Freezers (Aug. 3, 2007), http://www.energystar.gov/ia/partners/product_specs/program_reqs/refrig_prog_req.pdf. Therefore, the HRF-1-1979 testing standard specified for demonstrating compliance with the mandatory energy efficiency standards is also used to demonstrate conformance with the Energy Star criteria. *Id.*

44.     Congress provided significant procedural safeguards for any change in an Energy Star product category, specification, or criterion, including: (1) requiring an industry-wide notice and comment process; and (2) identifying 270 days as "appropriate lead time" for implementation of a revision to an Energy Star criterion. 42 U.S.C. § 6294a.

45.     The statute specifically obligates DOE to, <u>inter alia,</u>

(5) <u>solicit comments from interested parties</u> prior to establishing or revising an Energy Star product category, specification, or criterion (or prior to effective dates for any such product category, specification, or criterion);

(6) on adoption of a new or revised product category, specification, or criterion, <u>provide reasonable notice to interested parties of any changes (including effective dates)</u> in product categories, specifications, or criteria, along with—

(A) <u>an explanation of the changes;</u> and

(B) as appropriate, responses to comments submitted by interested parties; and

(7) <u>provide appropriate lead time (which shall be 270 days,</u> unless the Agency or Department specifies otherwise) prior to the applicable effective date for a new or a significant revision to a product category, specification, or criterion, taking into account the timing requirements of the manufacturing, product marketing, and distribution process for the specific product addressed.

42 U.S.C. § 6294a (emphasis added).

46.     Participation in Energy Star has a significant impact on the marketability of products, particularly for the fast-growing "French Door" segment that is at issue in this action.

C.      **The 2008 Agreement**

47.      In 2008, a disagreement arose between DOE and LG concerning LG's application of the test procedure set forth in HRF-1 for refrigerator-freezers. The dispute arose following a Consumer Reports article critical of DOE's testing criteria. Shortly thereafter, DOE threatened LG alone with an enforcement action, even while recognizing that LG's then-current testing criteria were consistent with industry practices.

48.      On November 14, 2008, LG reached an agreement with DOE that sets forth the appropriate testing criteria for various "model number series" and "similar and derivative models" – a test procedure consistent with the test procedure required by HRF-1-1979. The 2008 Agreement makes clear that under this test procedure, the fill tube and ice ejection heaters are turned off.

49.      In reaching the 2008 Agreement, DOE did "not dispute LG's interpretation of the governing aspect of the test procedure in question was made in good faith and reflected a common approach to the interpretation of that aspect."

50.      In paragraph 3 of the 2008 Agreement, DOE and LG agreed to at least three critical provisions.

51.      First, DOE and LG agreed that the energy efficiency of LG's affected models of refrigerator-freezers would be confirmed using testing procedures "consistent with DOE's interpretation of the operating conditions specified in HRF-1."

52.      Second, DOE and LG agreed that certain sources of energy that LG had previously excluded when calculating energy consumption would prospectively be deemed not part of the ice maker and included in future testing. In addition, DOE and LG agreed that in future testing, the ice storage bin would be kept at a temperature that would prevent the ice from

melting. However, they also agreed that "consistent with DOE's interpretation of the operating conditions specified in HRF-1," the fill tube heaters and ejection heaters could remain off, thus testing them as part of the ice maker.

53.      Third, DOE and LG agreed that paragraph 3 would control energy efficiency tests "subject to further notice by DOE."   At the time of the 2008 Agreement, DOE and LG contemplated that this "notice" would be an industry-wide notice and comment rulemaking, not a unilateral letter to LG.

54.      Thus, the 2008 Agreement set forth DOE's view that its regulations allow manufacturers to turn the fill tube heater and ejection heater off during testing.   The 2008 Agreement states that the testing procedures required in paragraph 3, which allow the fill tube and ice ejection heaters to remain off, are "<u>consistent with DOE's interpretation of the operating conditions specified in HRF-1</u>." (emphasis added).

55.      LG has acted in good faith and fulfilled all if its commitments under the 2008 Agreement. To implement the 2008 Agreement, LG has spent tens of millions of dollars, updated its testing procedures in accordance with the 2008 Agreement, and has also made numerous modifications in its products in response to the 2008 Agreement.   Also in accordance with the 2008 Agreement, LG continued to test its French Door refrigerators with the fill tube and ice ejection heaters off to demonstrate compliance with the mandatory and Energy Star energy efficiency standards.

**D.     DOE's Industry-Wide Endorsement of the Testing Criteria Set Forth in the**
**2008 Agreement**

56.     In its November 14, 2008 press release announcing the 2008 Agreement with LG,
DOE similarly indicated that the 2008 Agreement was intended to ensure that LG followed a
"test procedure, which has been used for decades and is based on a well-recognized and industry-
wide adopted procedure . . . ."   DOE clearly indicated that LG was committing to follow the
same testing standard as the rest of industry. *See* DOE Press Release at 2 ("To effectively
measure the savings associated with the ENERGY STAR® program, all partners must report
energy consumption data based on the same standardized test procedures."). At no point did the
2008 Agreement or DOE's characterization of the 2008 Agreement suggest that LG was allowed
to apply anything other than the same testing criteria that were applicable to all other
manufacturers.

57.     Following the 2008 Agreement, on January 13, 2009, DOE issued a "Public
Statement on Proper Implementation of Refrigerator-Freezer Test Procedure," which it continues
to post on its website as of November 17, 2009, describing the "Application of 10 CFR Part 430,
Subpart B, Appendix A-1" ("Test Procedure Statement").   DOE's Test Procedure Statement
indicates that energy consuming components "involved in the production, harvesting, or storage
of ice" are considered part of the ice maker and are excluded from the reported total energy
usage. The ice maker's fill tube and ice ejection heaters appropriately fall within this definition
and, as such, DOE's Test Procedure Statement shows that they are part of the automatic ice
maker and should be turned off during testing.

58.     LG is not alone in its understanding that DOE's testing standard, until DOE's
November 10, 2009 letter, provided that  the fill tube and ice ejection heaters may be turned off

during testing. Indeed, Whirlpool made a filing with DOE in February 2008, acknowledging that the LG fill tube heater is properly off when testing under the DOE standard.

59.     Recently, Natural Resources Canada ("NRCan"), which applies a testing standard consistent with the DOE regulation, has similarly interpreted DOE's regulations as allowing the fill tube and ice ejection heaters to remain off during testing. In a May 5, 2009 statement, NRCan explained that "[a] refrigerator-freezer equipped with an automatic icemaker must be tested according to the 10 CFR Part 430, Subpart B, Appendix A-1 in a manner that satisfies the following conditions during the test . . . ." NRCan then listed these conditions, which included that "the fill tube and ice ejection heaters . . . may remain **OFF**." *See* http://oee.nrcan.gc.ca/residential/business/manufacturers/testing/refrigerators-notice.cfm?attr=0.

## II.     DOE's Pending Rulemaking Process

60.     Whether and how energy used by ice makers should be addressed in calculating a refrigerator-freezer's energy consumption has been the subject of recent and ongoing debate throughout the refrigerator-freezer industry.

61.     LG understands and has supported DOE's efforts to update its regulations on an industry-wide basis through a proper notice-and-comment rulemaking as required by law, and will conform its products to any properly promulgated standard. DOE cannot, however, in the interim change the testing criteria through a letter that demands near-immediate compliance with the newly-announced requirements, and that retroactively revokes the Energy Star recognition of products already on the market that were manufactured and offered for sale in good faith reliance on the existing testing requirements as provided in the regulations and the 2008 Agreement.

62.     "The Energy Independence and Security Act of 2007, Public Law 110-140 (Dec. 19, 2007), requires DOE to publish a final rule by December 31, 2010, to determine whether to amend the standards in effect for refrigerators, refrigerator-freezers, and freezers manufactured

on or after January 1, 2014." *See* 74 Fed. Reg. at 58916.  DOE has since embarked on the rulemaking process required by the EISA to amend the refrigerator-freezer energy standards and related test procedures.  In 2008, DOE published a detailed *Energy Conservation Standards Rulemaking Framework Document for Residential Refrigerators, Refrigerator-Freezers, and Freezers* (DOE, Sept. 29, 2008) ("DOE 2008 Framework"), and held a public stakeholders meeting to discuss this document on September 28, 2008.  On November 16, 2009, DOE announced the availability of its *Preliminary Technical Support Document: Energy Efficiency Program For Consumer Products: Refrigerators, Refrigerators-Freezers, and Freezers* (DOE, November 2009) ("DOE 2009 Technical Report"), and a public meeting to be held on December 10, 2009 to discuss DOE's rulemaking plans.  79 Fed. Reg. 58915 (November 16, 2009).

63.    DOE has expressly observed that it has not revised the HRF-1-1979 refrigerator testing standard in any relevant way since it was adopted in 1982, and that one of the purposes of the current rulemaking is to engage the public and regulated community to address a number of technical issues regarding that standard.  *See, e.g., DOE 2008 Framework* at pp. 6-7 (observing that DOE's existing regulation continues to refer to the 1979 version of AHAM HRF-1) and *DOE 2009 Technical Report* at p. ES-6 (noting that DOE was initiating a rulemaking to amend its refrigerator test procedures).

### III.    Defendants' Adoption of Its Unlawful Regulatory Regime.

#### A.        The November 10, 2009 Letter

64.    On September 1, 2009, LG received a letter from DOE's Acting Program Manager for the Building Technologies Program Scott E. Hine.  The letter stated that DOE had "become aware that some manufacturers of refrigerator-freezers equipped with French Doors, through-the-door ice service, and a bottom-mounted freezer . . . may not have properly applied the current DOE test procedure for refrigerator freezers."  The letter requested that LG ship to

DOE for testing two units of each of its basic refrigerator-freezer models equipped with French Doors, through-the-door ice service, and a bottom-mounted freezer that it manufactures and certifies as Energy Star-qualified.  LG complied with DOE's request.

65.     DOE's September 1, 2009 letter provided no indication that DOE was changing its testing criteria.

66.     By letter dated November 10, 2009, the DOE General Counsel stated that:  (1) DOE is changing the testing standard agreed to by the parties in the 2008 Agreement by eliminating the exclusion of the "fill tube and ice ejection heaters" from the test procedure defined by paragraph 3; and (2) subjecting LG to a modified testing standard effective in 15 days.

67.     DOE's November 10, 2009 letter improperly states that the 2008 Agreement established an "exception to DOE's existing test procedure for refrigerator-freezers."  The testing standard required by DOE's regulations, HRF-1-1979, requires that automatic ice makers be "inoperative" during testing.  Because the fill tube and ice ejection heaters are involved in the production and harvesting of ice, respectively, they are components of the ice maker and may be turned off.  DOE is mischaracterizing and misinterpreting the word "exception" as it appears in paragraph 3 of the 2008 Agreement.  That paragraph expressly sets forth "DOE's interpretation of the operating conditions specified in HRF-1," as requiring that the ice making system be disabled for purposes of making ice, and requiring that "all other system components remain on" with the "exception" of the fill tube heater and ice ejection heater, which may remain off.  The plain language of the 2008 Agreement thus demonstrates that it was DOE's interpretation of the testing standard itself that allowed the fill tube heater and ice ejection heaters to be turned off due to the fact they are involved in the production and harvesting of ice.  Thus, the 2008

Agreement did not create an exception for LG, but rather articulated a valid, industry-wide testing criteria under HRF-1 that components involved in the production, harvesting, and storage of ice are to be inoperative.

68.     DOE does not dispute that LG has complied with the terms of the 2008 Agreement.   DOE also does not dispute that LG's products satisfy the energy efficiency standards and Energy Star Program criteria when tested under the criteria specified in the 2008 Agreement.   DOE's letter states that it "provides notice pursuant to paragraph 3 of that Agreement regarding the test procedure to be used for testing models under the Agreement going forward."   The letter states that "DOE received the results from independent lab testing" that applied DOE's modified testing requirements and that, under those requirements, the LG models that were tested "would neither qualify for ENERGY STAR, nor comply with the applicable energy efficiency standards."

69.     DOE's letter orders, in part, that the "ENERGY STAR label must be removed by LG from all models covered by this notice that are still within its possession or control, within 15 days from the date of this letter.  LG must also take all reasonable steps to notify retailers to remove the ENERGY STAR label from the models covered by this notice within 15 days from the date of this letter."

70.     DOE's letter thus seeks to apply its newly-adopted testing criteria retroactively to refrigerators already in commerce carrying Energy Star labels based on the agreed-upon test procedure.

71.     The letter further orders that "LG may continue to distribute in commerce models covered by this notice for 120 days."  However, the letter states that after that date, LG must only distribute in commerce models that satisfy the energy efficiency standards when tested according

to DOE's modified testing requirements, e.g. with the fill tube heater and ice ejection heater turned on.

72.     The 120-day time frame (which was later extended by DOE to become 127 days) will also have retroactive effect because DOE seeks to apply the revised testing standards to product that has been manufactured in compliance with DOE's prior established testing standard. This action violates EPCA, which "grandfathers" all products that are in use and comply with a previous standard. 42 U.S.C. § 6293(e)(3).

73.     Since the November 10, 2009 letter, Plaintiff has been in repeated and extensive communication with the Defendants, but has failed to reach a resolution. One consequence of these communications is that DOE adjusted the deadlines set forth in the November 10, 2009 letter. DOE's revised deadline for complying with its demands with respect to the Energy Star label is January 2, 2010; its revised deadline for applying its modified testing criteria for purposes of the mandatory energy efficiency standards is March 17, 2010 (127 days after the November 10, 2009 letter).

**B.      The Test Reports On Which DOE Bases Its Action**

74.     On November 23, 2009, DOE for the first time provided LG with test reports prepared by CSA International and BR Laboratories, Inc.  DOE's November 10, 2009 letter indicates that DOE's decision to revise its testing standards is based on these test results.

75.     By letter dated November 24, 2009, LG alerted DOE to its significant concerns about the reliability of the test data.  LG explained that the test results on which DOE claimed to base its modified testing requirements appear to be significantly flawed and incomplete.

76.     Remarkably, even though DOE's November 10, 2009 letter asserted that its testing was done "according to the existing DOE test procedure," DOE's test results show that it

was not based on the then-existing DOE testing criteria, which allowed the fill tube and ice ejection heaters to remain off. Moreover, the test results do not appear to be consistently based on the testing standard that DOE appears to adopt, but not fully-articulate, in its November 10, 2009 letter. Although DOE's November 10, 2009 letter states that "energy consumed by the fill tube and ice ejection heaters must be counted" under its revised testing standard, DOE has not provided a complete description of its revised testing criteria.

77.     The test reports did not clearly describe the testing standard that was used and, in fact, appear to be using inconsistent testing standards. The CSA International test method appears to *exclude* energy associated with ice ejection heaters, while the BR Laboratories test method appears to *include* energy associated with ice ejection heaters. In addition, at least some of the tests used criteria that are not set forth in HRF-1-1979, the testing standard required by DOE's regulations. One CSA International test report indicates that CSA International employed a test method – known as CSA Informs – that was not published until August 24, 2009, 10 days *after* the report was issued. Notably, the CSA Informs testing standard is not consistent with HRF-1-1979. For example, the CSA Informs standard conducts its testing with the ice bin full, which has never been required under HRF-1-1979.

78.     The testing also produced widely divergent results from different tests of the same models (up to 15%), calling into question the reliability and accuracy of these results. The test results show that LG's models sometimes satisfied the energy efficiency standards. Finally, the testing reports also failed to include complete data for the conducted testing. The CSA International report and two of the BR Laboratories, Inc. reports did not include any time, temperature, or wattage data, while the four other BR Laboratories, Inc. reports only included half of that data.

79.     LG's November 24, 2009 letter also reiterated the need for DOE to clarify the testing criteria to which it has demanded LG comply. While DOE has cited its test results as the basis for changing the testing standard, those test results appear to be based on inconsistent testing criteria and flawed analysis, and the reports do not describe the testing standards that they employed. Therefore, not only does DOE's letter provide insufficient information for LG to understand the precise testing standard that DOE is now demanding it apply, the test results show that DOE may not have even used a consistent testing standard in deciding to change its requirements.

**C.      The November 25, 2009 Email**

80.     On November 25, 2009, DOE's General Counsel sent LG an email stating that "[a]s of the end of this year, LG can no longer rely on the exception to meet the applicable ENERGY STAR criteria for models covered by the November 2008 Agreement. These models will be de-listed from ENERGY STAR as of January 2, 2010, unless before that date LG provides DOE with data demonstrating, to our satisfaction, that the models comply with the applicable ENERGY STAR criteria when tested without the exception, i.e., including energy consumed by the fill tube and ice ejection heaters. For all de-listed models, the ENERGY STAR label cannot be present at the point of sale as of January 2, 2010."

81.     The email also noted that DOE planned to "issue further public guidance on the correct application of DOE's test procedure" by mid-December. Thus, LG will have at most a few weeks to comply with a newly articulated testing standard prior to the January 2, 2010 deadline.

82.     DOE further stated that by December 22, 2009, "LG must provide DOE with a plan that outlines the actions it will take at each of the various steps in the manufacturing,

distribution, and retail chain to ensure that the label will be removed or covered on units as of January 2, 2010."

83.    DOE added that on January 2, 2010, "DOE will communicate to retailer participants in the ENERGY STAR program that the models have been de-listed.  DOE will monitor compliance with random checks of retailers to ensure that ENERGY STAR labels are not present on de-listed models at the point of sale."  DOE has also stated that "[a]t the time of de-listing, DOE will announce publically that it has taken this action and identify the LG models that are no longer eligible for ENERGY STAR."

84.    As of December 2, 2009, Defendants continued to reject LG's request that DOE follow proper rulemaking procedures.  As a result, LG was forced to file this Complaint.

**D.      The Immediate Threat of Irreparable Harm**

85.    As a result of DOE's action, LG will suffer immediate, concrete, and substantial irreversible injury.  Termination from the Energy Star program will have serious negative repercussions for LG, for its brand far beyond these specific products, for its reputation among consumers, and for its core relationships with its retail customers.  LG will also undoubtedly suffer a significant loss in market share as a result.  LG's out-of-pocket costs to comply with DOE's testing requirements and unreasonable timeframe for its adoption are likewise irreparable.

86.    Because the Energy Star label is affixed to the Energy Guide label, DOE's order that LG remove the Energy Star label from units that do not comply with its new testing requirements by January 2, 2010, threatens additional irreparable harm to LG.  In addition to removing the Energy Star logo, DOE's new test protocol would change the energy efficiency number on the mandatory disclosure label, so that manufacturers would be required to conduct new tests, design and print new labels, and then place the labels on new production units.

87.     The energy conservation requirements require that manufacturers affix an Energy Guide label depicting the estimated annual energy usage of a refrigerator-freezer based on results from the relevant test procedure from DOE's regulations.  Because DOE has not disclosed the full dimensions of its modified testing criteria, LG has inadequate information on which to update the Energy Guide label pursuant to DOE's new requirements.  Administration of the Energy Star program is shared by the Environmental Protection Agency and the Federal Trade Commission.  DOE's actions thus has the potential to cause LG irreparable injury by triggering programmatic concerns by other agencies.

88.     DOE's decision to change its testing requirements for purposes of EPCA's energy efficiency standards also threatens LG with irreparable harm.  DOE has provided only 127 days lead time, which is not adequate time to allow LG to complete the necessary, but time-consuming steps associated with the implementation of a revised testing standard, which include redesign, reengineering, and appropriate testing.

## CLAIMS FOR RELIEF

### Count I

### (Violation of 42 U.S.C. § 6294a; 5 U.S.C. § 706(2))

### DOE Violated the Statute Governing Changes to Energy Star Criteria.

89.     LG incorporates by reference all allegations contained in paragraphs 1 through 88 of the Complaint, as set forth fully herein.

90.     The APA authorizes this Court to set aside agency action that was "without observance of procedure required by law."  5 U.S.C. § 706(2)(D)).

91.     DOE's action violates its mandatory statutory duties under 42 U.S.C. § 6294a(5)-(7).

92.     DOE failed to "solicit comments from interested parties prior to establishing or revising an Energy Star product category, specification, or criterion (or prior to effective dates for any such product category, specification, or criterion)," as required by 42 U.S.C. § 6294a(5).

93.     DOE's action also violates 42 U.S.C. § 6294a(6) because, in adopting its revised testing criteria, DOE failed to "provide reasonable notice to interested parties of [the] changes (including effective dates)" along with "an explanation of the changes" and "as appropriate, responses to comments submitted by interested parties."

94.     Lastly, DOE did not "provide appropriate lead time (which shall be 270 days, unless the Agency or Department specifies otherwise) prior to the applicable effective date for a new or a significant revision to a product category, specification, or criterion, taking into account the timing requirements of the manufacturing, product marketing, and distribution process for the specific product addressed" in violation of 42 U.S.C. § 6294a(c)(7).

95.     The November 10, 2009 letter to LG was not preceded by any opportunity for notice and comment by LG or anyone else and as such, DOE failed to observe the procedure required by 42 U.S.C. § 6294a.  Accordingly, Defendants' actions with respect to the Energy Star program are unlawful and should be set aside.

### Count II

### (Violation of 5 U.S.C. §§ 553, 706(2)(A) & (D))

### DOE Fundamentally Changed In Its Interpretation of Its Regulations Without The Notice and Comment Required by The APA.

96.     LG incorporates by reference all allegations contained in paragraphs 1 through 95 of the Complaint, as set forth fully herein.

97.     "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Alaska Professional Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1033-1034 (D.C. Cir. 1999); *see also Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003) ("new rules that work substantive changes in prior regulations are subject to the APA's procedures."); *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 586 (D.C. Cir. 1997) (agency violates APA if it makes a "fundamental change in its interpretation of a substantive regulation without notice and comment").

98.     Importantly, "[t]hose regulated by an administrative agency are entitled to 'know the rules by which the game will be played.'" *Alaska Professional Hunters*, 177 F.3d at 1035 (citation omitted).

99.     DOE's November 10, 2009 letter announces changes to DOE's previously accepted testing standard that substantively and significantly change DOE's interpretation of the testing criteria required by its regulations.  Under the 2008 Agreement and consistent with DOE's established interpretation of its testing standards, DOE recognized that the fill tube and ice ejection heaters could remain off during testing.  In contrast, DOE's modified testing standard, announced in its November 10, 2009 letter, states that LG must include energy from the fill tube and ice ejection heaters when determining a model's energy efficiency.

100.     Defendants' failure to comply with the statutory and legal requirements for providing notice and comment is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

101.     Accordingly, Defendants' implementation of its modified testing requirements with respect to LG is unlawful and must be set aside.

## Count III

## (Violation of 5 U.S.C. §§ 553, 706(2)(A) & (D))

### DOE's Modification of its Established Testing Criteria is Arbitrary and Capricious.

102.    LG incorporates by reference the allegations contained in paragraphs 1 through 101 of the Complaint, as set forth fully herein.

103.    Pursuant to the 2008 Agreement, the fill tube heater and ice ejection heater may remain off during testing, "consistent with DOE's interpretation of the operating conditions specified in HRF-1." DOE's November 10, 2009 letter significantly changes this testing standard by requiring that "energy consumed by the fill tube and ice ejection heaters must be counted in determining a model's energy efficiency." DOE's actions, described in the November 10, 2009 letter, constitute a significant modification of the testing criteria required by DOE's regulation. DOE's adoption of this modified testing standard was arbitrary and capricious in at least four respects.

104.    First, DOE failed to disclose the administrative record for its action. Defendants' failure to disclose the test protocols, test results, and other information on which its modified testing requirements are based before adopting them is arbitrary and capricious.

105.    Second, as the basis for changing its testing requirements, DOE relied on a flawed and inconsistent testing procedure, and incomplete data. After ordering LG to comply with its modified testing criteria, DOE provided LG with some of the test results on which its decision was based. LG's preliminary review of the test reports has revealed significant flaws and inconsistencies in the testing criteria used to conduct the testing. The testing data is also incomplete. In addition, the data DOE has disclosed appears to be based on testing standards

that are not approved by any DOE regulation.   The accuracy of the testing is also called into question by the testing's contradictory results.

106.   Third, DOE failed to provide "interested persons an opportunity to participate in the rule making" as required by the APA.  5 U.S.C. § 553(c).  Defendants' failure to allow LG the opportunity to review and rebut the test protocols, test results, and other information before demanding that LG comply with its new testing procedure requirements is arbitrary and capricious.  Although DOE has now provided LG some of the test reports, DOE has not provided LG sufficient time to review and comment on this data.  In addition, as a result of its failure to provide LG an opportunity to comment on its modified testing requirements, DOE also failed to comply with its duty to respond to LG's comments in a reasoned manner.  *See Rodway v. USDA*, 514 F.2d 809, 817 (D.C. Cir. 1975); *ACLU v. FCC*, 823 F.2d 1554, 1581 (D.C. Cir. 1987).

107.   Fourth, the time frame provided by Defendants to apply the changed testing standard for purposes of evaluating Energy Star compliance does not reflect an informed or realistic understanding of the manufacturing process for these products.   DOE's failure to provide adequate lead time for LG to adapt the modified testing criteria is arbitrary and capricious.

108.   Defendants' action is thus arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

109.   Accordingly, Defendants' modified interpretation of the testing criteria required by its regulation is unlawful and should be set aside.

**Count IV**

**(Violation of 5 U.S.C. § 706(2)(A) & (D))**

**DOE's Interpretation of the 2008 Agreement Is Arbitrary and Capricious.**

110.   LG incorporates by reference the allegations contained in paragraphs 1 through 109 of the Complaint, as set forth fully herein.

111.   DOE's interpretation of the 2008 Agreement with LG and, in particular, that Agreement's notice provision is arbitrary and capricious.

112.   Defendants' interpretation of the clause in paragraph 3 of the 2008 Agreement with LG that prescribes the appropriate testing procedure "subject to further notice by DOE" as allowing it to summarily and fundamentally change that testing criteria is completely contrary to the concept of notice and cannot be reconciled with a fair reading of the balance of the 2008 Agreement.

113.   The 2008 Agreement's provision setting forth the appropriate testing criteria "subject to further notice by DOE" cannot logically or reasonably be read to reserve to DOE the right to summarily and fundamentally revise the testing standard and order that the revised standard be applied retroactively and with only about two weeks lead time.  Interpreting the notice provision in this manner, would mean that in this negotiated agreement, LG effectively consented to a provision allowing DOE to unilaterally abrogate the key term in the 2008 Agreement – the testing standard – by agency fiat, with or without cause.  This would be unreasonable.  It would also be contrary to the parties' understanding at the time of the 2008 Agreement that "notice" would involve notice-and-comment rulemaking.

114.   LG has fully complied with its obligations under the 2008 Agreement.

115.    Accordingly, Defendants' attempts to invoke the "notice" provision of the 2008 Agreement is arbitrary and capricious and must be set aside.

## Count V

### (Violation of 42 U.S.C. § 6291 *et seq.*; 5 U.S.C. §§ 553, 706(2)(A) & (D))

### DOE's Retroactive Application of its Modified Testing Requirements Is Arbitrary and Capricious.

116.    LG incorporates by reference the allegations contained in paragraphs 1 through 115 of the Complaint, as set forth fully herein.

117.    The APA requires the Court to set aside agency actions or conclusions that are arbitrary, capricious, or an abuse of discretion, or which were adopted not in accordance with the law or without observing legally required procedures. 5 U.S.C. § 706(2)(A), (D); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375 (1989).

118.    Defendants' attempt to apply its modified testing standard retroactively with respect to units that have already been labeled as Energy Star under the test procedures that were previously approved by DOE and that are consistent with DOE and LG's 2008 Agreement is arbitrary and capricious.  It is arbitrary and capricious, and utterly contrary to the Agreement, for DOE to seek to require existing products that have already been tested in accordance with the Agreement and the energy efficiency standards effective at that time to comply with an entirely new procedure.  Retroactive rulemaking is not favored in the law and should be rejected here. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("administrative rules will not be construed to have retroactive effect unless their language requires this result," and "a statutory grant of legislative rulemaking authority will not … encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms").

119.    DOE's action also violates EPCA. 42 U.S.C. § 6291 *et seq.* DOE's attempt to apply its amended testing standard to products that have already been tested in compliance with DOE's prior testing criteria (and in accordance with the 2008 Agreement) contravenes 42 U.S.C. § 6293(e). That statute explicitly grandfathers products manufactured "before the date on which the amended energy conservation standard becomes effective . . . ." 42 U.S.C. 6293(e)(3).

120.    Defendants' demand that, by January 2, 2010, LG remove the Energy Star label from all models covered by the 2008 Agreement and take reasonable steps to notify retailers to remove the Energy Star label is thus arbitrary and capricious.

## Count VI

### (Violation of Fifth Amendment Of The Constitution)

### DOE's Action Violates LG's Due Process Rights By Depriving It Of a Protected Interest Without Any Hearing or Process.

121.    LG incorporates by reference all allegations contained in paragraphs 1 through 120 of the Complaint, as set forth fully herein.

122.    DOE's letter violates the Due Process clause of the Fifth Amendment to the Constitution by (1) seeking to apply a modified standard retroactively without providing fair notice of the standard, and (2) taking summary action to deprive LG of its protected interests without providing any type of hearing or process at all.

123.    The Fifth Amendment to the United States Constitution provides that "no person shall be deprived of life, liberty, or property without due process of law." Due process requires notice and an opportunity to be heard *prior* to government deprivation of a person's liberty or property, except in a genuine emergency or other extraordinary circumstances making a pre-deprivation hearing infeasible. Even where extraordinary circumstances may justify summary

deprivation of liberty or property, the Constitution requires, at a minimum, a prompt, meaningful post-deprivation hearing before a neutral decision-maker.

124.    DOE's action violates these essential due process requirements.  DOE has not provided a hearing, much less an impartial one, on a unilateral order prior to its issuance, and it does not provide any timely and meaningful post-deprivation hearing.

125.    Accordingly, Defendants' actions with respect to LG are unlawful and must be set aside.

WHEREFORE, LG prays that this Court:

A.    Enter a declaratory judgment pursuant to 28 U.S.C. § 2201(a) in favor of LG and against Defendants, by:

(i) declaring that the November 14, 2008 Agreement remains in full effect;

(ii) declaring that Defendants' modified testing criteria was adopted without observance of procedure required by law, is therefore without force and effect, and is set aside;

(iii) declaring that Defendants' modified testing criteria is arbitrary, capricious, an abuse of discretion, or not in accordance with law and is set aside;

(iv) declaring that Defendants' order requiring LG to remove Energy Star labels and take other actions set forth in Defendants' November 10, 2009 letter, as modified by Defendants' November 25, 2009 email, was arbitrary, capricious, an abuse of discretion, or not in accordance with law and is set aside;

B.    Issue an Order granting injunctive relief:

(i) barring Defendants from implementing their modified testing criteria against LG or anyone else until Defendants conduct lawful and proper procedures;

(ii) prohibit Defendants from implementing any of the actions required of LG under  Defendants' November 10, 2009 letter, as modified by Defendants' November 25, 2009 email, or any similar actions that would prejudice LG;

C.      Award reasonable attorneys' fees; and

D.      Award any other relief this Court deems appropriate.

Respectfully submitted,

Jeffrey T. Green (Bar No. 426747)
*Counsel of Record
Peter R. Steenland, Jr. (Bar No. 79236)
Roger R. Martella, Jr. (Bar No. 976771)
Rachel D. Gray (Bar No. 485507)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Plaintiff LG Electronics U.S.A., Inc.*

December 4, 2009

## Exhibit A

## Fill Tube Heater

