**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LG ELECTRONICS U.S.A., INC.,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 09-2297 (JDB)** |
| **United States DEPARTMENT OF ENERGY, and STEPHEN CHU, PHD., United States Secretary of Energy,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

The Department of Energy ("DOE") has ordered LG Electronics U.S.A., Inc. ("LG") to remove the "Energy Star" energy efficiency label from approximately 40,000 of its refrigerators by January 20, 2010. Currently before the Court is [3] LG's motion for a preliminary injunction that would allow it to retain the Energy Star label on these refrigerators. LG argues that DOE's actions violate the Administrative Procedure Act, 5 U.S.C. § 551 et seq., the Energy Policy and Conservation Act, 42 U.S.C. § 6291 et seq., and LG's due process rights. The Court heard oral argument on the motion on January 11, 2010. Upon consideration of the relevant legal authorities, the parties' memoranda, the entire record herein, and for the reasons discussed below, the Court denies LG's motion.

**BACKGROUND**

**I. Statutory Background**

The Energy Policy and Conservation Act ("EPCA") establishes an energy conservation program for major household appliances. EPCA, along with the National Energy Conservation

-1-

Policy Act of 1978, grants DOE the authority to regulate the energy efficiency of household

appliances such as refrigerators and freezers, and prescribes minimum energy efficiency

standards for such appliances.  See 42 U.S.C. § 6295.

For most refrigerators and freezers to qualify for the Energy Star program, they must be at

Federal law also governs the now-ubiquitous Energy Star labeling program.  The Energy

Star program, jointly administered by DOE and the Environmental Protection Agency, seeks to

"identify and promote energy-efficient products and buildings . . . through voluntary labeling of

. . . products and buildings that meet the highest energy conservation standards."  42 U.S.C. §

6294a(a).  Manufacturers whose products comply with certain energy efficiency standards may

enter into a licensing agreement with the government to permit their qualifying products to carry

the Energy Star label.  See Defs.' Opp'n to Pl.'s Mot. ("Defs.' Opp'n") [Docket Entry 10], Decl. of

Catherin Zoi ("Zoi Decl."), ¶ 6.

For most refrigerators and freezers to qualify for the Energy Star program, they must be at

least 20% more energy efficient than the minimum efficiency standards set by law.  See

Department of Energy, Energy Star Program Requirements for Residential Refrigerators and/or

Freezers (Aug. 3, 2007), at 3-4, available at http://www.energystar.gov/ia/partners/product_specs

/program_reqs/refrig_prog_req.pdf.  Federal regulations detail the testing criteria that DOE uses

to determine the energy efficiency of refrigerators and freezers.  See 10 C.F.R. pt. 430, subpt B,

app. A1.  Pursuant to these regulations, a refrigerator's "[o]perational conditions" during testing --

such as the temperature of the refrigerator -- are supplied by the so-called AHAM-HRF-1-1979

test ("HRF-1 test"), a procedure initially developed by the Association of Home Appliance

Manufacturers.  Id. § 2.2.  Of relevance here, the HRF-1 test provides that, during energy

efficiency testing, "[a]utomatic ice makers are to be inoperative."  See Pl.'s Mem. in Support of

its Mot. ("Pl.'s Mem.") [Docket Entry 3], Exhibit 7 (HRF-1 test) ¶ 7.4.2.

## II. Factual Background

This dispute concerns the interpretation of the HRF-1 test's term "inoperative," as applied to icemakers on certain LG "French Door" refrigerator models.  French Door refrigerators have a bottom drawer freezer and double doors on top for fresh food, and they offer through-the-door ice and water service.  See Pl.'s Mem., Decl. of Timothy McGrady ("McGrady Decl."), ¶¶ 4-5. These refrigerators are the fastest growing segment of the refrigerator market.  See Pl.'s Mem., Decl. of Timothy Kavanaugh ("Kavanaugh Decl."), ¶ 5.

French Door refrigerators incorporate a separate ice-making assembly within the fresh food compartment of the refrigerator.  See Defs.' Opp'n, Decl. of Michael McCabe ("McCabe Decl."), ¶ 9.  As the refrigerators' "fresh food compartment must be maintained above freezing temperatures, and the ice making assembly within it must be maintained below freezing temperatures," French Door models use heaters to function properly.  Id. at ¶ 10.

The parties' disagreement in this case centers around how energy usage should be calculated for two heaters found in LG's French Door refrigerators: the "fill tube heater" and the "ice ejection heater."[1]  These components consume significant amounts of energy even when the refrigerator is not actively making ice.  Thus, whether the HRF-1 test's requirement that the icemaker be "inoperative" during testing means that the icemaker is "powered completely off," or that it is "powered on, but not actively making ice," could determine whether a refrigerator

---

[1] The icemaker's "fill tube" is a small pipe that carries water to a mold in the ice maker where water is frozen into ice.  The fill tube heater keeps the water from freezing in the fill tube. See McGrady Decl. at ¶ 6.  The ice ejection heater ensures that the ice can be separated from the mold and ejected into a storage area of the ice maker.  See id. at ¶ 7.

-3-

qualifies for the Energy Star label, or fails to meet even the statutory minimum energy efficiency standards.

In 2008, a dispute arose between LG and DOE concerning the procedures LG was using to test the energy efficiency of certain French Door refrigerator models.[2]  In November of that year, the two sides entered into an agreement which detailed how these refrigerator models were to be tested.  See Pl.'s Mem., Exhibit 2 (LG-DOE 2008 Agreement), ¶ 3.  Specifically, the Agreement provided that energy efficiency tests of affected refrigerator models would be performed

> using testing procedures consistent with DOE's interpretation of the operating conditions specified in [the] HRF-1 [test], which require that the ice making system of the refrigerator-freezer be disabled for purposes of making ice but that all other system components remain on during testing with the exception of the fill tube and ice ejection heaters, which may remain off for the purposes of testing under this Agreement subject to further notice by DOE.

Id.

In the fall of 2009, DOE received reports from two laboratories which concluded that certain LG refrigerators bearing the Energy Star label did not meet the Energy Star criteria, and that some did not meet even the statutory minimum efficiency standards.  McCabe Decl. at ¶¶ 40-41.  Although the record is largely silent as to what happened next, it appears that LG wrote to DOE that it believed these tests were not performed according to the procedures specified in the parties' 2008 Agreement.  See Pl.'s Mem., Exhibit 1 (November 10, 2009 Letter from DOE to LG ("November 10 Letter")), at 1 (referring to a September 22, 2009 letter from LG to DOE).

---

[2] This dispute apparently arose over the temperature of the refrigerators' ice storage bins during testing, and was unrelated to the parties' present disagreement.  See Transcript of Oral Argument ("Tr."), 57-58.

On November 10, 2009, in a letter that would eventually prompt this lawsuit, DOE wrote to LG that the agency had concluded that "LG's reliance on the test procedure exception set out in the [parties' November 2008] Agreement" -- allowing the fill tube and ice ejection heaters to remain off during energy efficiency testing -- "has given LG an unintended advantage in the marketplace and resulted in significant underreporting of the energy consumption of LG models to both DOE and consumers." November 10 Letter at 2. The letter continued: "consistent with the terms of the Agreement, DOE is providing LG with notice that the agency is revoking the exception provided in . . . the Agreement and [is] requiring LG to follow the DOE test procedure," which, according to the agency, would require the fill tube and ice ejection heaters to remain on during testing. Id. DOE demanded that LG remove the Energy Star label from certain French Door refrigerator models still within its possession, and that it notify retailers to remove the label from these refrigerators in their stores. Id.[3] At oral argument, LG represented that approximately 40,000 refrigerators already in or on their way to the U.S. market are affected. See Tr. at 12.

After efforts to resolve the dispute proved unsuccessful, LG filed suit on December 4, 2009. LG's complaint seeks injunctive relief as well as a declaratory judgment that, inter alia, DOE's November 10 letter ordering LG to remove the Energy Star label from existing refrigerators is arbitrary and capricious. Compl. at 35-36.[4] LG filed a motion for a preliminary

---

[3] DOE's letter allowed LG until November 25, 2009 to remove the Energy Star label from its affected refrigerator models and until March 9, 2010 to remove from commerce any models that did not meet the statutory minimum energy efficiency standards. See id. DOE has since extended these deadlines to January 20, 2010, and March 16, 2010, respectively.

[4] LG initially also sought relief from the prospective application of DOE's "modified"
(continued...)

injunction on December 9, 2009.  The Court heard oral argument on the motion on January 11,

2010.

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary and drastic remedy, one that should be

granted only when the moving party, by a clear showing, carries the burden of persuasion.  See

Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); see also Munaf v. Geren, 128 S.Ct. 2207,

2219 (2008).  To obtain a preliminary injunction, the moving party must demonstrate (1) a

substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without

injunctive relief, (3) that an injunction would not substantially harm the defendants or other

interested parties (balance of harms), and (4) that issuance of the injunction is in the public

interest.  See Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir.

2006); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).

A district court weighing whether to grant a preliminary injunction must "'balance the

strengths of the requesting party's arguments in each of the four required areas.'"  Chaplaincy of

Full Gospel Churches, 454 F.3d at 297 (quoting CityFed Fin. Corp. v. Office of Thrift

Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995)).  Despite this flexibility, "a party seeking a

preliminary injunction must demonstrate . . . a likelihood of success on the merits."  Munaf, 128

S. Ct. at 2219 (internal quotation marks omitted).  Further, "[a] movant's failure to show any

irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other

---

[4](...continued)
testing criteria.  See Compl. at 35-36.  LG has since voluntarily agreed to produce French Door
refrigerator models that DOE appears to agree will comply with the requisite Energy Star
standards.  See Pl.'s Reply in Support of its Mot. ("Pl.'s Reply") [Docket Entry 14], at 2.

three factors entering the calculus merit such relief." <u>Chaplaincy of Full Gospel Churches</u>, 454

F.3d at 297; <u>see also</u> <u>Winter v. Natural Res. Def. Council, Inc.</u>, 129 S. Ct. 365, 375 (2008) (a

plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction," and

not a mere "possibility").

Many of LG's claims arise under the Administrative Procedure Act ("APA").  Under the

APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that

are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5

U.S.C. § 706(2)(A), in excess of statutory authority, <u>id.</u> § 706(2)(C), or "without observance of

procedures required by law," <u>id.</u> § 706(2)(D).  The scope of review, however, is narrow.  <u>See</u>

<u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43

(1983).  The court is to presume that the agency's action is valid.  <u>See</u> <u>Citizens to Preserve</u>

<u>Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971).  And the "court is not to substitute its

judgment for that of the agency."  <u>State Farm</u>, 463 U.S. at 43.  Nonetheless, the court must be

satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory

explanation for its action including a rational connection between the facts found and the choice

made.'"  <u>Alpharma, Inc. v. Leavitt</u>, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting <u>State Farm</u>, 463 U.S.

at 43).

## <u>ARGUMENT</u>

## I.      **Likelihood of Success**

### A.      <u>LG's APA Challenges</u>

LG contends that DOE's actions violate both the APA's procedural and substantive

requirements.  The Court takes each in turn.

1.    *APA Procedural Challenges*

LG argues that, in the parties' 2008 Agreement, DOE adopted the "definitive interpretation" that the HFR-1 test permits refrigerators' fill tube and ice ejection heaters to remain completely powered off during energy efficiency testing. <u>See</u> Pl.'s Mem. at 25-26. Once an agency has given a regulation a definitive interpretation, "it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." <u>Paralyzed Veterans of Am. v. D.C. Arena L.P.</u>, 117 F.3d 579, 586 (D.C. Cir. 1997); <u>see also</u> <u>Alaska Prof'l Hunters Ass'n, Inc. v. Fed. Aviation Admin.</u>, 177 F.3d 1030, 1034 (D.C. Cir. 1999). Accordingly, LG reasons, DOE's November 10 letter requiring LG to test all its refrigerators with the icemaker and its components powered on but "disabled for purposes of making ice" constitutes a substantive change to DOE's definitive interpretation of the HRF-1 testing criteria that requires a full notice-and-comment rulemaking. <u>See</u> Pl.'s Mem. at 25.

For an interpretation to be definitive, however, it must be "'express, direct, and uniform.'" <u>Metwest Inc. v. Sec'y of Labor</u>, 560 F.3d 506, 510 (D.C. Cir. 2009) (quoting <u>Ass'n of Am. R.Rs. v. Dep't of Transp.</u>, 198 F.3d 944, 949 (D.C. Cir. 1999)). The agency must have expressed the kind of "'fair and considered judgment' that can be thought of as an authoritative departmental position" "upon which affected parties could reasonably rely." <u>Paralyzed Veterans</u>, 117 F.3d at 587 (quoting <u>Auer v. Robbins</u>, 519 U.S. 452, 462 (1997)). DOE did not adopt such a definitive interpretation in the parties' 2008 Agreement.

The basis for LG's argument that the 2008 Agreement represents DOE's definitive interpretation of the HRF-1 test is the contract's provision that refrigerators covered by the Agreement would be tested

> using testing procedures consistent with DOE's interpretation of the operating
> conditions specified in [the] HRF-1 [test], which require that the ice making
> system of the refrigerator-freezer be disabled for purposes of making ice but that
> all other system components remain on during testing with the exception of the
> fill tube and ice ejection heaters, which may remain off for the purposes of testing
> under this Agreement subject to further notice by DOE.

2008 Agreement at ¶ 3.

LG reads this language such that the phrase "consistent with DOE's interpretation of the

[HRF-1 test's] operating conditions" includes within its scope the fact that the fill tube and ice

ejection heaters "may remain off for the purposes of testing."  Pl.'s Reply at 12-13.  Thus, the

argument goes, through this Agreement DOE announced to the entire industry its definitive

interpretation that the HRF-1 test permits fill tube and ice ejection heaters to remain powered off

during testing.

The Court concludes that the better reading of this provision of the Agreement, however,

is that LG's refrigerators are generally subject to the HRF-1 testing procedures, which,

"consistent with DOE's interpretation," "require that the ice making system of the refrigerator-

freezer be disabled for purposes of making ice but that all other system components remain on

during testing."  Under the Agreement, then, LG is afforded an "exception" to DOE's

interpretation of the HRF-1 test, whereby LG may keep the fill tube and ice ejection heaters off

for purposes of testing "under this Agreement."

The Court's reading of the contract is supported by the Agreement's language, which

permits the fill tube and ice ejection heaters to "remain off for purposes of testing under this

Agreement."  Were LG's interpretation of the contract correct, the words "under this Agreement"

would be wholly superfluous: "consistent with DOE's interpretation of the operating conditions,"

LG could <u>always</u> keep the fill tube and ice ejection heaters off, whether or not testing procedures were governed by the 2008 Agreement.  Indeed, LG all but conceded as much during oral argument.  <u>See</u> Tr. 26-27.  Thus, the only way to give this phrase meaning is to read the Agreement as granting LG a dispensation to keep its fill tube and ice ejection heaters off during testing, <u>despite</u> DOE's contrary interpretation of the HRF-1 test.  <u>See</u> Restatement (Second) of Contracts § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

Further, the Agreement states that the two heaters "may remain off for the purposes of testing under this Agreement <u>subject to further notice by DOE</u>."  If the Court were to accept LG's reading of the contract, it would mean that DOE adopted a definitive interpretation of the HRF-1 test -- which would, by definition, be binding on all industry -- but then reserved the right to withdraw that interpretation at will from LG and only LG.  Such a reading would implicitly hold that DOE attempted to contract around the APA, and the Court declines to do so.

LG responds that the word "notice" refers to a full notice-and-comment rulemaking, implying that DOE <u>did</u> intend the Agreement to constitute the sort of definitive interpretation that may only be revised through compliance with the APA's procedural requirements.  Pl.'s Mem. at 28-29.  But there is nothing in the Agreement's language or structure to suggest this is the case, and the absence of any explicit reference to formal rulemaking in the text in fact suggests the opposite.  Further cutting against LG's argument, the contract provides that "[n]otices and all other correspondence related to the obligations listed in this Agreement shall be delivered" to representatives of each party.  2008 Agreement at ¶ 17(h).  The language in paragraph three of

the Agreement is the contract's only mention of "notice."  Construing the reference to "notice" in paragraph 3 as requiring a full notice-and-comment rulemaking, then, would render paragraph 17(h) all but meaningless.  See Restatement (Second) of Contracts § 203(a).[5]

In another effort to sustain its reading of the 2008 Agreement, LG contends that DOE could not have granted it a special "exception" to the testing criteria because such waivers may only be granted in response to a petition, and after the opportunity for public notice and comment.  See Pl.'s Mem. at 27 n.8 (citing 10 C.F.R. § 430.27).  But this is not so.  The regulation LG points to concerns petitions to waive testing requirements when an appliance "contains one or more design characteristics which . . . prevent testing of the basic model according to the prescribed test procedures," or where the test would "provide materially inaccurate comparative data."  10 C.F.R. § 430.27(a)(1).  Neither is the case here.

LG also points to a DOE press release issued contemporaneously with the 2008 Agreement that purportedly supports its argument that the Agreement constitutes DOE's definitive interpretation of the HRF-1 test.  LG refers to the following language: "To effectively measure the savings associated with the Energy Star program, all partners must report energy consumption data based on the same standardized test procedures.  Today's agreement ensures

_____

[5] With its reply brief, LG has offered an additional declaration along with several exhibits that purportedly establish that LG intended and understood that the testing procedures in the Agreement were to remain in effect until DOE gave notice through a formal rulemaking.  See Pl.'s Reply, Decl. of John Taylor ("Taylor Decl.") & Attached Exhibits.  The Court need not address this extrinsic evidence, however, because the meaning of the term "notice" is clear.  See Brubaker v. Metro. Life Ins. Co., 482 F.3d 586, 590 (D.C. Cir. 2007) ("Where the terms of a contract are clear, that is the end of the matter; we need not look to extrinsic evidence . . . ."); Consolidated Gas Transmission Corp. v. FERC, 771 F.2d 1536, 1544 (D.C. Cir. 1985) ("If a contract is not ambiguous, extrinsic evidence cannot be used as an aid to interpretation.").

that LG's future measurements of energy usage for refrigerators and freezers will help assure consumers have accurate information."  Pl.'s Mem., Exhibit 12 (DOE Press Release), 2.  This statement is of little value.  It observes that effective measurements of energy savings require consistent test procedures, but it does not declare that LG's test procedures are now, pursuant to the Agreement, consistent with the rest of industry's.  Indeed, the press release offers only that the Agreement will "help assure [that] consumers have <u>accurate</u> information," not that they will have "consistent" information.[6]

The Court concludes that the 2008 Agreement, fairly read, reflects the fact that DOE was merely granting LG an exception to its interpretation of the HRF-1 test for certain refrigerators. At the least, however, the foregoing discussion reveals that the 2008 Agreement is ambiguous as to whether DOE's position was that the HRF-1 test requires the fill tube and ice ejection heaters to remain off, or whether DOE was granting LG an exception to its interpretation of the testing procedures.  This ambiguity, by itself, establishes that the 2008 Agreement does not represent DOE's definitive interpretation of the HRF-1 test.  <u>See</u> <u>Metwest</u>, 560 F.3d at 510 (a definitive interpretation must be "'express, direct, and uniform'" (quoting <u>Ass'n of Am. R.Rs.</u>, 198 F.3d at 949)).

LG also implies that industry guidance DOE issued in January 2009 represents DOE's definitive interpretation of the regulation.  This guidance clarifies "that energy consuming

_____

[6] LG has offered several other exhibits to support its belief that the 2008 Agreement represented DOE's definitive interpretation of the HRF-1 test.  These exhibits are irrelevant to the Court's analysis, however, as they represent the opinions of non-U.S. governmental entities, or carry the express disclaimer that they do not necessarily reflect the views of the United States Government.  <u>See, e.g.</u>, Pl.'s Mem., Exhibit 10 (Letter from Electrolux); Pl.'s Reply, Supp. Decl. of Timothy McGrady ("McGrady Supp. Decl."), Exhibits 2 (1996 Report on Energy Use in Refrigerators), 15 (Canada's Energy Efficiency Regulations).

components that interact with the ice making system but are not involved in the production,

harvesting, or storage of ice . . . are not considered part of the automatic ice maker.  Accordingly,

the energy consumed by these components is included in calculating a product's reported total

energy usage."  Pl.'s Mem., Exhibit 13 (January 2009 Guidance).

LG is correct that this guidance offers some support for its position that DOE interpreted

the HRF-1 test to permit fill tube and ice ejection heaters to remain off during testing.  The

guidance states that energy consumed by components that <u>are not</u> involved in the production,

harvesting, or storage of ice is <u>included</u> in total energy usage.  The implication, then, is that the

energy used by components that <u>are</u> "involved in the production, harvesting, or storage of ice" --

and DOE has not disputed that the fill tube and ice ejection heaters are so involved -- is <u>excluded</u>

from total energy usage.  Nonetheless, the Court cannot conclude that, entirely by negative

implication, DOE was in its January 2009 Guidance expressing the sort of "'fair and considered

judgment' that can be thought of as an authoritative departmental position."  <u>Paralyzed Veterans</u>,

117 F.3d at 587 (quoting <u>Auer</u>, 519 U.S. at 462); <u>see also</u> <u>Metwest</u>, 560 F.3d at 510 (a definitive

interpretation must be "'express, direct, and uniform'" (quoting <u>Ass'n of Am. R.Rs.</u>, 198 F.3d at

949); <u>id.</u> (if a new guidance document "'can reasonably be interpreted' as consistent with prior

documents, it does not significantly revise a previous authoritative interpretation" (quoting <u>Air</u>

<u>Transp. Ass'n of Am. v. Fed. Aviation Admin.</u>, 291 F.3d 49, 57-58 (D.C. Cir. 2002))).

In sum, prior to its November 10, 2009, letter, DOE had never issued a definitive

interpretation to industry that the HRF-1 test permits refrigerators' fill tube and ice ejection

heaters to remain powered off during energy efficiency testing.  If anything, the 2008 Agreement

suggests that DOE held the opposite view.  Accordingly, DOE was not required to engage in

notice and comment rulemaking under the APA before seeking to enforce its November 10 letter, and the Court concludes that LG has little likelihood of success on the merits of this APA challenge to DOE's actions.[7]

At the motions hearing, LG argued that even assuming DOE had not adopted a definitive interpretation of the HRF-1 test that would bind all of industry, the agency still could not apply its "new" testing criteria to the approximately 40,000 LG refrigerators that are at issue here.  See Tr. at 30-31.  According to LG, these refrigerators were produced before DOE's January 20, 2010, deadline pursuant to the testing criteria set forth in the parties' 2008 Agreement (and in reliance on that Agreement).  Applying new testing criteria to these units, LG insists, would be an impermissible retroactive agency action.  Before reaching the merits of LG's argument, however, the Court must first determine whether the LG refrigerator models at issue here were within, and hence produced under, the terms of the 2008 Agreement.

In the introduction to the 2008 Agreement, the parties purported to resolve all disputes relating to "the LG refrigerator-freezers equipped with French Doors and through-the-door ice service set forth below (hereafter referred to as 'the Affected Models')."  2008 Agreement at 1. The Agreement later identifies these "Affected Models" as refrigerators falling within certain model number series,[8] as well as "any and all similar or derivative models made for any LG

---

[7] LG's argument that DOE failed to comply with EPCA's procedural requirements before changing the Energy Star testing criteria, see Pl.'s Mem. at 21-25, fails for similar reasons. Because DOE's actions did not revise any Energy Star specification or criterion, but merely expressed an interpretation of existing regulations, the agency did not need to adhere to EPCA's notice, comment, and lead time requirements.  See 42 U.S.C. § 6294a.

[8] These model series are: LFX25950, LFX25960, LFX25971, LFX23961, LFX21960ST, LFX21971ST, LFX21980ST, LFX25980ST, LMX21981ST, and LMX25981ST.  See 2008 Agreement, at ¶ 1.

Original Equipment Manufacturer customers whose products are sold in the United States."

2008 Agreement, at ¶ 1.

DOE stated at oral argument that the model series explicitly listed in the 2008 Agreement

"were all discontinued" or are "not the ones that are at issue in this case." Tr. at 52.  This

representation comports with a December 18, 2009, letter from DOE to LG which lists the

refrigerator models for which DOE has now, over a year later, terminated the Energy Star

agreement.  See Defs.' Opp'n, Exhibit 4 (December 18, 2009 letter), 1-2.  None of the model

series identified in the December 18, 2009, letter match those listed in the 2008 Agreement.  Id.[9]

LG has not disputed the government's representation that none of the models listed in the

2008 Agreement are at issue in the present dispute.  Instead, LG argues that the affected

refrigerators are "similar or derivative models within the[] product lines" listed in the Agreement.

Tr. 71.  That may be so.  But, by its terms, the 2008 Agreement applies only to "similar or

derivative models" when they are "made for any LG Original Equipment Manufacturer customers

whose products are sold in the United States."  2008 Agreement, at ¶ 1.  DOE stated at the

hearing that these "are Kenmore brand models."  Tr. 51; see Tr. 83 ("That refers to Kenmore

brand refrigerator-freezers that LG manufactures to carry the Kenmore brand."); see also DOE

Press Release, at 1 ("The following models are affected by today's agreement: [the model series

listed in footnote 8, supra,] as well as comparable Kenmore-brand 'TRIO' models designed and

manufactured by LG.").  LG did not disagree.[10]

---

[9] The model series named in the letter are: LFX28977, LFX25975, LFX21975, LMX25985, 7973 (Sears), 7975 (Sears), and 7978 (Sears).  Id.

[10] LG also points to an email written by Richard Wingate, LG's general counsel, two days
(continued...)

Because the parties' 2008 Agreement, by its plain terms, does not extend to the refrigerators at issue in this dispute, DOE did not retroactively apply its "new" testing criteria to refrigerators that were covered by the Agreement.  Therefore, the Court concludes that LG has no likelihood of success on the merits of its retroactivity argument.

2.    *APA Substantive Challenges*

In addition to its allegations that DOE violated the APA's procedural requirements, LG also contends that DOE's actions are arbitrary and capricious in several ways.

LG first argues that DOE "has not cited any legitimate ground for revoking the Agreement."  Pl.'s Mem. at 28-29.  But in its November 10, 2009 letter, DOE told LG that it was revoking the Agreement's testing exception because the agency felt it "has given LG an unintended advantage in the marketplace and [has] resulted in significant underreporting of the energy consumption of LG models to both DOE and consumers."  November 10 Letter, at 2.  LG may disagree with the data or reasoning underlying this explanation -- indeed, LG raises a separate APA challenge to the testing data -- but DOE's stated justifications for revoking the Agreement's testing exception are not themselves arbitrary and capricious.

LG also insists that DOE is subjecting it to inconsistent testing standards.  On December 18, 2009 -- after LG filed its motion for a preliminary injunction -- DOE issued additional guidance to industry about its energy efficiency testing procedures.  See Department of Energy,

---

[10](...continued)
before the 2008 Agreement was signed.  Tr. at 73 (citing Pl.'s Reply, Taylor Decl., Exhibit 4 (November 12, 2008 Email).  In it, Mr. Wingate relays his understanding of the Agreement, writing "[i]t [is] further agreed that until DOE issues further guidance and that guidance becomes effective, future production of 'Affected Models' can be done on the basis of these heaters being off."  Wingate Email, at 1.  LG misses the point: the refrigerators at issue here are not "Affected Models," as defined in the Agreement.

Additional Guidance Regarding Application of Current Procedures for Testing Energy

Consumption of Refrigerator-Freezers with Automatic Ice Makers (Dec. 18, 2009) ("December

Guidance"), available at http://www1.eere.energy.gov/buildings/appliance_standards/residential/

pdfs/rf_test_procedure_addl_guidance.pdf.  LG contends that this "December Guidance is

markedly different than the testing criteria that DOE ordered LG to apply just weeks earlier in its

November Order."  Pl.'s Reply at 10-11.  Subjecting LG to two inconsistent standards mere

weeks apart, LG implies, is arbitrary and capricious.

    The Court sees nothing materially inconsistent between DOE's November 10, 2009,

letter, and the agency's subsequent December Guidance.  In November, DOE wrote to LG that,

during testing, "the ice making system of the refrigerator-freezer [must] be disabled for purposes

of making ice but . . . all other system components [must] remain on during testing including the

fill tube and ice ejection heaters."  November 10 Letter, at 2 (emphasis removed).  In its

December Guidance, DOE stated that, during testing,

> ice makers and all ice making components -- including the fill tube heater and ice
> ejection heater -- must be on and functioning as they would be when the icemaker
> is not actively making ice.  The ice maker and all ice making components --
> including the fill tube heater and ice ejection heater -- may be rendered
> 'inoperative' by preventing the machine from making ice during the test, such as
> by creating a condition in which the machine senses a full bin of ice.

December Guidance, at 3.

    These two statements appear consistent in all material respects.  To be sure, their

language differs significantly.  But the Court cannot ascertain any distinction between an

icemaker that is "disabled for purposes of making ice" but with its components turned on

(including the heaters at issue), and an icemaker and its components (including the heaters) that

are turned "on and functioning as they would be when the icemaker is not actively making ice."

Indeed, when the Court asked LG at oral argument how the standards differed, LG failed to

identify specific inconsistencies between the two.  See Tr. 43-44.  Instead, LG offered that "the

November order was not as specific as the December guidance."  Tr. 44.  This may be true.  But

the Court nonetheless sees nothing arbitrary and capricious in DOE's wholly consistent

instructions to LG about its interpretation of the HRF-1 test.

Finally, LG contends that DOE's actions are arbitrary and capricious because the testing

data the agency relied upon in its November 10 letter was flawed.  Pl.'s Mem. at 29-32.  In that

letter, DOE wrote that "[w]hen tested according to the existing DOE test procedure . . . [certain

LG refrigerator models] would neither qualify for Energy Star, nor comply with the applicable

energy efficiency standards."  November 10 Letter, at 1-2.  DOE apparently based this conclusion

on testing data obtained from two independent laboratories, CSA International and BR

Laboratories.  See McCabe Decl. at ¶¶ 40-41.

LG argues that these laboratories' testing data "is fundamentally flawed" because the

laboratories tested LG's refrigerators in a manner inconsistent with DOE's testing criteria.  Pl.'s

Reply at 15.  For example, LG contends that BR Laboratories conducted some of its tests with

the refrigerators' icemakers powered on and actually producing ice.  See Pl.'s Mem. at 31.  LG

has offered two declarations by Timothy McGrady, an Environmental Manager at LG, to support

its position.  See generally McGrady Decl. at ¶¶ 22-25; McGrady Supp. Decl. at ¶¶ 17-20, 29, 32.

DOE, relying on its own declarations submitted by Michael McCabe, a senior agency engineer,

disagrees with Mr. McGrady's characterization of the testing results, and specifically denies that

the laboratories' tests were conducted in a manner inconsistent with DOE's testing criteria.  See

generally McCabe Decl. at ¶¶ 42-43; Supp. Decl. of Michael McCabe ("McCabe Supp. Decl.") ¶¶ 30-32.

The Court has reviewed the experts' declarations, as well as the laboratories' reports to the extent they have been provided.  See Pl.'s Mem., Exhibit 15 (BR Laboratories Test Results).  At this stage, however, LG has not shown a likelihood of success on its challenge.  Mr. McGrady and Mr. McCabe offer completely differing opinions as to whether the two laboratories properly followed DOE's testing criteria, and the Court has been given no reason to accept LG's expert's opinion over DOE's.  The Court has no declarations from individuals who actually conducted the testing at issue.  Nor has the Court had the benefit of live testimony, or independent testing performed by a disinterested third party, to resolve this highly technical issue.  Indeed, although apparently through no fault of LG's, the Court still has not been provided with the two laboratories' complete testing results.  Moreover, when, as here, an agency "is evaluating scientific data within its technical expertise," the Court must give the agency "an extreme degree of deference."  Am. Farm Bureau Fed'n v. EPA, 559 F.3d 512, 519 (D.C. Cir. 2009) (internal quotation marks omitted); see also Am. Radio Relay League, Inc. v. FCC, 524 F.3d 227, 233 (D.C. Cir. 2008) ("Where a 'highly technical question' is involved, 'courts necessarily must show considerable deference to an agency's expertise.'" (quoting MCI Cellular Tel. Co. v. FCC, 738 F.2d 1322, 1333 (D.C. Cir. 1984))).  Given this deference, and especially at this initial stage, then, LG has not met its burden to show a likelihood of success on the merits of its challenge to the testing data underlying DOE's November 10, 2008 letter.

B.      LG's Due Process Challenges

LG contends that DOE's insistence that it remove the Energy Star label from

approximately 40,000 refrigerators that have already been manufactured and tested violates the Constitution by depriving LG of constitutionally protected property and liberty interests without due process of law.

        1.    *Due Process Property Interest*

      To determine whether DOE's actions violate LG's due process property rights, the Court must first examine whether LG is threatened with the deprivation of a constitutionally protected property interest.  Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999).  "Only after finding the deprivation of a protected interest" may the Court analyze whether the government's procedures "comport with due process."  Id.  Here, LG contends that "the primary interest at issue" is "LG's protected interest against summary and retroactive action to demand removal of the Energy Star designation from products in commerce."  Pl.'s Reply, at 17 n.15.  In other words, LG claims a protected property interest in having the 40,000 or so refrigerators at issue here continue to bear the Energy Star label.

      The due process clause protects "the security of interests that a person has already acquired in specific benefits."  Bd. of Regents v. Roth, 408 U.S. 564, 576 (1972).  These constitutionally protected property interests "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Id. at 577.  For example, in Roth, the scope of Roth's "'property' interest in employment at Wisconsin State University-Oshkosh was created and defined by the terms of his appointment."  Id. at 578.

      In this case, LG's asserted property interest arises through a contract.  Although the

Energy Star program is created, and its energy efficiency standards prescribed, by law, companies may only participate in the program after signing individual licensing agreements.  LG entered into such a licensing agreement with DOE in 2001.  See Defs.' Opp'n, Zoi Decl., Exhibit A (2001 LG-DOE Energy Star Licensing Agreement).  Thus, LG's participation in the Energy Star program, and any rights it has for its qualifying products to bear the Energy Star label, are derived through its licensing agreement with DOE.

The Court, however, need not decide whether LG's asserted right to maintain the Energy Star labels on the refrigerators at issue gives rise to a constitutionally protected property interest. Compare Lujan v. G & G Fire Sprinklers, 532 U.S. 189, 196 (2001) ("[W]e assume for purposes of decision here that G&G has a property interest in its claim for payment [pursuant to the contract] . . . ."), with Taake v. County of Monroe, 530 F.3d 538, 541 (7th Cir. 2008) ("'[I]t has long been settled that a mere breach of contract by the government does not give rise to a constitutional claim.'" (quoting Sudeikis v. Chicago Transit Auth., 774 F.2d 766, 770 (7th Cir. 1985)).  For even if the Court assumes that the parties' 2001 licensing agreement creates a constitutional property interest in maintaining the Energy Star labels on existing products, LG is not entitled to any process against DOE beyond a post-deprivation lawsuit.  "[A] claim that a government agency has violated a party's right to due process by refusing performance under a contract," as here, "is substantively indistinguishable from a breach of contract claim." Suburban Mortg. Assocs. v. Dep't of Housing and Urban Develop., 480 F.3d 1116, 1127-28 (Fed. Cir. 2007).  But due process property interests that derive from contract "can be fully protected by an ordinary breach-of-contract suit." Lujan, 532 U.S. at 196.  Thus, "[t]he process to which plaintiff is due" under these circumstances "is a post-deprivation suit for breach of the contract."

<u>Suburban Mortg. Assocs.</u>, 480 F.3d at 1128.

        2.      *Due Process Liberty Interest*

      LG also claims that it has a "'liberty interest in avoiding the damage to its reputation and business caused by a stigmatizing suspension'" from the Energy Star program.  Pl.'s Reply at 17 (quoting <u>Reeve Aleutian Airways, Inc. v. United States</u>, 982 F.2d 594, 598 (D.C. Cir. 1993)). Indeed, "government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due Process Clause."  <u>Trifax Corp. v. Dist. of Columbia</u>, 314 F.3d 641, 644 (D.C. Cir. 2003).

      The narrow and conditional removal from a voluntary government program seen here, however, bears no resemblance to a broad preclusion from a chosen trade or business.  LG has not been permanently barred from the Energy Star program.  Nor is LG prevented from using the Energy Star label on whatever qualifying appliances it sells.  Indeed, so far as the Court can tell, LG will be able to use the Energy Star label on new French Door refrigerator models that it plans to sell beginning January 20, 2010 -- mere days from now.  <u>See</u> Pl.'s Reply at 2.  And LG may still market and sell existing refrigerators that do not bear the Energy Star label.  Being required to remove Energy Star labels from certain refrigerators will in no way broadly preclude LG from its chosen trade or business so as to implicate a due process liberty interest.  Accordingly, LG has not demonstrated a likelihood of success on its due process claims.

*     *     *     *     *

      In sum, LG has not shown a likelihood of success on the merits of any of its APA, EPCA, or due process claims.  Hence, LG has failed to establish this prong of the preliminary injunction analysis.

II.     **Irreparable Harm**

In light of LG's failure to demonstrate a likelihood of success on the merits of its claims, to obtain a preliminary injunction LG must provide an overwhelming showing that it will suffer irreparable harm absent immediate court intervention.[11] "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is 'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'" Hi-Tech Pharmacal Co. v. Food and Drug Admin., 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (quoting Gulf Oil Corp. v. Dept. of Energy, 514 F. Supp. 1019, 1026 (D.D.C. 1981)). "[T]he alleged injury must be certain, great, actual, and imminent." Id. (citing Wisc. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). LG has not made this showing here.

LG first contends that it will suffer irreparable harm because forcing it to remove Energy Star labels from thousands of refrigerators will cause -- LG fears -- definite and substantial harm to its reputation. Pl.'s Mem. at 37-38; see Armour & Co. v. Freeman, 304 F.2d 404, 406 (D.C. Cir. 1962) ("damage" to a business's "good name" may constitute irreparable injury); 11A Wright & Miller, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."). The Energy Star label is undoubtedly of great importance to consumers and removing the labels, LG asserts, will damage its standing in the marketplace.

---

[11] In fact, LG's failure to show a likelihood of success may itself be dispositive. See Munaf, 128 S. Ct. at 2219 ("[A] party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits." (emphasis added; internal quotation marks omitted)); see also Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J, concurring) ("[U]nder [Munaf], a movant cannot obtain a preliminary injunction without showing both a likelihood of success and a likelihood of irreparable harm, among other things.").

The Court finds, however, that any reputational harm LG will suffer by removing Energy Star labels from a limited number of units in one line of its refrigerators will be relatively trivial. LG has represented to the Court that it is already manufacturing French Door refrigerators that comply with DOE's testing criteria.  See Tr. at 3-5.  Thus, by January 20, 2010 -- the date by which LG must remove the Energy Star labels from existing French Door refrigerators -- LG will be in a position to sell new French Door refrigerators that do bear the Energy Star label. Therefore, retailers will, without significant interruption, continue to sell LG French Door refrigerators that bear the Energy Star label, ensuring that most consumers will have no idea that LG was forced to remove Energy Star labels from some of its existing refrigerators.[12]  Moreover, any reputational harm LG will suffer will be especially minor in light of LG's worldwide reputation.  Besides refrigerators, LG manufactures a wide variety of consumer appliances, among them cell phones, televisions, washers and dryers, ovens, and air conditioners.  See generally http://www.lge.com.  DOE's actions will impact only LG's refrigerators, and only a limited volume of a particular kind of refrigerator at that.  There will be no effect on any of LG's numerous other consumer appliances, thus narrowing the scope of any reputational harm.

LG also argues that DOE's actions will cause it significant and irreparable monetary harm.  See Pl.'s Mem. at 41-42.  Harm that is "merely economic" is not generally considered irreparable, see Wisc. Gas Co., 758 F.2d at 674, but "unrecoverable financial loss can constitute

---

[12] In its opening brief, LG maintained that its reputation with retailers would be also harmed absent an injunction.  See Pl.'s Mem. at 38.  These fears, however, were largely based on the premise that DOE was "effectively banning LG's 'French Door' models entirely from the market for several months."  Id.  These concerns have been resolved given that LG is already producing new models of Energy Star-compliant French Door refrigerators for shipment and sale.

irreparable injury under some circumstances." <u>Coalition for Common Sense in Gov't Procurement v. United States</u>, 576 F. Supp. 2d 162, 169 n.3 (D.D.C. 2008) (citing cases); <u>see also</u> <u>Brendsel v. Office of Fed. Hous. Enter. Oversight</u>, 339 F. Supp. 2d 52, 66 (D.D.C. 2004).

Even assuming LG will not be able to recover monetary damages from DOE, however, the financial impact LG claims it will suffer does not rise to the level of irreparable harm.  LG has estimated its potential financial losses if an injunction does not issue.  <u>See</u> Kavanaugh Decl. at ¶ 15.[13]  But these figures represent a minuscule portion of the company's worldwide revenues, <u>see</u> <u>id.</u> at ¶ 4 (LG is a subsidiary of "a $45 billion global technology leader"), and are no different from other financial losses that have not risen to the level of irreparable harm.  <u>See, e.g.</u>, <u>Sandoz, Inc. v. Food and Drug Admin.</u>, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (loss of less than 1 percent of total sales not irreparable harm); <u>Apotex, Inc. v. Food and Drug Admin.</u>, 2006 WL 1030151, at *16-17 (D.D.C. 2006) (loss of 1.4 percent of company's annual revenue not irreparable harm); <u>Bristol-Myers Squibb Co. v. Shalala</u>, 923 F. Supp. 212, 220-21 (D.D.C. 1996) ("[A] loss of less than 1 percent of total sales is not irreparable harm.").

Finally, LG contends that without an injunction it will lose significant market share.  It observes that, following the 2008 Agreement -- which temporarily required the removal of Energy Star labels from certain LG models -- it lost a significant portion of the French Door refrigerator market.  <u>See</u> Kavanaugh Decl. at ¶ 11(a)-(c).  LG fears that DOE's actions will cause similar disruption this time.  But "[c]ourts within the [D.C.] Circuit have generally been hesitant to award injunctive relief based on assertions about lost opportunities and market share." <u>Mylan Pharms., Inc. v. Shalala</u>, 81 F. Supp. 2d 30, 42-43 (D.D.C. 2000) (citing cases).  Loss of market

---

[13] These estimates have been filed under seal.

share is simply economic harm by another name, and LG has not shown the sort of substantial

financial losses that might rise to the level of irreparable harm.  Hence, with this case now

limited to the issue of removing the Energy Star label from a limited volume of refrigerators

already in the market, LG has failed to establish that it will suffer irreparable harm if an

injunction does not issue.[14]

## III.     Harm to DOE or to other Third Parties

Although LG will not suffer irreparable harm if DOE's actions are not enjoined, neither

DOE nor other third parties will suffer any significant harm if an injunction issues.  DOE insists

that, if the Court grants LG's motion, consumers purchasing "mislabeled" Energy Star products

will be harmed through greater-than-expected utility bills.  See Defs.' Opp'n at 40.  But this same

harm has already befallen everyone who has purchased such refrigerators, and DOE apparently

has no plans to inform "these unfortunate consumers," id., that the Energy Star label may not

accurately reflect their refrigerators' energy usage, see Tr. at 69-70.  This inaction suggests that

even DOE believes the harm to consumers from an injunction will be relatively minor.

Nor is the Court persuaded that LG's competitors or DOE will suffer any substantial harm

if the Court issues a preliminary injunction.  If DOE's actions are enjoined, LG may be able to

charge a higher price for its remaining inventory of non-Energy Star compliant refrigerators, as

they will bear the valuable Energy Star label.  But the record is silent as to what financial effect

this would have on other manufacturers, which in any event is not likely to exceed the monetary

_____

[14] Whether it is physically possible for LG to comply with DOE's January 20 deadline for
removing the Energy Star labels is not a question before the Court.  The Court notes that DOE
has represented to the Court that it "is going to be reasonable and assist LG" in complying with
the agency's demands.  Tr. 80-81.

harm LG will incur absent an injunction.  And, the Court observes, any effect an injunction will have on "DOE's ability to enforce compliance with the Energy Star criteria," <u>see</u> Defs.' Opp'n at 42, is wholly speculative.  Thus, this factor weighs slightly in LG's favor.

## IV.    Public Interest

Finally, the public interest factor supports DOE, as the public undoubtedly has a strong interest in ensuring that products bearing the Energy Star label have met the rigorous energy efficiency standards prescribed by law.  LG argues that "'the public interest is best served by having federal agencies comply with the requirements of federal law.'"  Pl.'s Mem. at 44 (quoting <u>Patriot, Inc. v. Dep't of Housing and Urban Develop.</u>, 963 F. Supp. 1, 6 (D.D.C. 1997)).  But the Court has already concluded that DOE appears to have fully complied with the law in this case.  Thus, although of only moderate relevance here, the Court finds that the public interest weighs against issuing an injunction.

## <u>CONCLUSION</u>

LG has not established a likelihood of success on the merits of its claims; nor has it shown that it will suffer irreparable harm without an injunction.  Each is a prerequisite for the extraordinary relief LG seeks.  Accordingly, the Court will deny LG's motion for a preliminary injunction.  A separate order accompanies this memorandum opinion.

/s/
_____
JOHN D. BATES
United States District Judge

Date: <u>January 18, 2010</u>